For argument before us is USAXREL Anthony Spay v. CVS Caremark Corp. et al. Mr. Raspanti. Yes, Your Honor. Mark Raspanti, Your Honor, of the Petrogallo Firm. On behalf of the appellant, my client, Anthony Spay, I respectfully request a three-minute reserve for rebuttal, Your Honors. Granted. Your Honor, we ask that this Court reverse the District Court's granting of summary judgment and remand the case back to the District Court. Let me ask this. Does it have to be, under the CWI-TAM scenario, does it have to be Sienta? Since we're basically talking fraud, I assume that Sienta is a requirement? Yes, Your Honor. Sienta is a requirement. Does it require materiality? I'm sorry? That requires materiality? Materiality and Sienta are two different things. If you're asking whether the statute requires materiality and Sienta, yes, it does. As to the fraud part. Yes, it does. What is it here? The governmental knowledge thing, that may well be a problem. I'm just speaking for myself. I concede that. Let's forget about the governmental knowledge thing. Whether or not there was one fraud, whether or not there was a loss, and I think that's where the District Court may have gone astray because they looked at that and they put governmental knowledge in and said, well, government knew this was going on, and they may have inferred, the Court may have inferred from that, well, there's really no fraud here. But forget labeling it governmental knowledge. If all that happened here, as I understand it, is that the logarithms were used as placeholders so that pharmacies that were actually disbursing drugs were getting paid for the drugs they were disbursing. It's not a situation where they're sending a press reimbursement for prescriptions they never filled. Where's the fraud? I don't think that's the issue, Honor. I think the issue got misplaced as to pharmacy fraud, and many parts of the District Court's opinion went off to pharmacy fraud. This is a building fraud case involving the intermediary Well, regardless of what you call it, regardless of what you call it, and these are factual points so far, and I do want to get to the government knowledge inference with you and what we should do about that, because I don't think we have precedential authority within this circuit that is adopted at this point, but we have a defendant here who was not submitting a false claim in the sense of a claim seeking some payment for which that claimant was not entitled, right? I disagree, Your Honor. Please point out in the record where there is an amount sought and received by CVS to which it was not entitled. Sure. CVS, care mark, acted as the PBM who took the PDE, which is the claim in this case, and submitted that to CMS for payment. Where's the loss to the government? The loss to the government, Your Honor, is that there is a mandatory requirement of honesty and that the PDE be contained with accurate information. I think we understand that. We get that. Because we don't know. Judge McKee just indicated that the pharmacy was dispensing drugs and everything was fine. We don't know whether the pharmacy was properly dispensing drugs because based on the record that's here, Your Honor, Judge McKee, these were placeholders. A placeholder suggests that you're going to go back in and take a dummy prescriber identifier, there were 2.2 million of them, and now place accurate information indicating that there was an actual doctor. That was never done. But you're assuming that the placeholder situation will subsequently be replaced by the name of the actual pharmacy or prescriber. No, not the pharmacy. The prescriber. The doctor. It was never done. And the reason it was never done is because it's not a placeholder. It's not a placeholder. But that doesn't mean it wasn't a placeholder. You're saying it's not a placeholder because the actual doctor's name who wrote the script was never put in. It was never in. It was made up. A placeholder suggests that you're going to go back and find out. There's a delay. Pharmacy dispensed to the Medicare beneficiary. PDM is paid to now find the 37 PDE points. One of which, the most important of which I would say, would be that there's an actual doctor and they have time to do that. There's a delay between the dispensing of the medication and the payment or submission of the claim. That's what Fairmark was paid to do. No placeholder was ever done. How do I know that, Your Honor? Because the PDE that was submitted was the same PDE that we reviewed. And in that PDE, there's no question, 2.2 million of those PDEs were dummy prescribers. They were to facilitate payment, weren't they, to CVS? I'm sorry, Your Honor? They were submitted to facilitate payment. They were submitted to facilitate payment to the sponsor. And the sponsor would then pay PBM. The entire Part D program is outsourced. An amount for which you cannot demonstrate on the record the party was not entitled to. You can't demonstrate because there's nowhere to find it. That's the point. Without knowing that there's a doctor. But you do have a record that demonstrates that administrators within the CMS were perfectly aware of this. I don't believe that. I'm sorry, Your Honor. And beyond that, there are portions of the record that demonstrate that CMS was concerned about getting these prescriptions out to those entitled to it under this entitlement program. You deny that there's deposition testimony that suggests that? I deny that the deposition testimony does not go as far as the court has indicated. First of all, the three CMS employees, two current and one former, never testified that they knew what the actual conduct was. Please look for these to see if your purposes to what Caremark's conduct was. If we get to the government inferences cases, Caremark never told the government that, no, we weren't calling you up and telling you there was a problem. We were sitting back at the house and we were jamming 20, 2.2 million prescriber identifiers, never going back, Judge McKee, and swapping out a placeholder with an actual doctor so that for fraud, waste, and abuse issues, for all kinds of validation issues, you won't know in 2006 or 2010 whether a doctor ever existed that prescribed the matter. With regard to the CMS employees, Your Honor, the court, for purposes of Rule 56 issues, weighed certain parts of the testimony. How about Jeffrey Grant's testimony? Jeffrey Grant's testimony was not a policy person. He testified that he reported to the country that he was, quote, aware that Part D plan sponsors would then resort to use of a dummy identifier in order to get that PDE record through the system. Right, but later on in the testimony, Your Honor, if you look at the totality of the testimony of all three employees, first of all, none of them said that they knew what the actual conduct. They might have known that at some point in time, there were some parts of PDE that might have done. Grant went back and forth with regard to winning or losing. I don't know whether he went back and forth, but he also said, with respect to prescriber ID, given the guidance we put out, it would not have required a person to provide an individual prescriber ID for every individual prescriber on every PDE, and you could file that certification legally, truthfully. That is one part of the testimony. Of course it is. We don't have enough time for me to read it. McCutcheon, who Grant reported to, Grant was not a policy holder, or not a policy maker. What's the best piece of evidence you have? What's your best piece of evidence to rebut that testimony that was just read to you? The best piece of evidence is multiple, Your Honor. First of all, we have unequivocal guidance. Unlike other cases, 2006, 2007, there's not a shred of written guidance issued by CMS during the relevant time period, 2006 and 2007, that ever went away from, you must put a unique prescriber identifier number. Number two, why is that a problem? Given what Grant said, I'm not sure that mitigates the situation. Why does that create an issue of fact in terms of Grant testimony? Because I come back to the fact, again, that these scripts were actually scripts written by doctors and the submissions were for actual prescriptions, so that the doctors would get paid. Going back to your question again, Your Honor, the record that exists, that goes into the government, there's no way to determine whether an actual doctor, if you look at Rob Vito's testimony, before the United States Congress in 2010, after the OIG issued a report on this very issue of prescriber IDs, which McCutcheon testified, Ms. McCutcheon testified that that was the first time that she ever knew about prescriber IDs, number one. Number two, none of the witnesses, the United States government actually showed up at the depositions and indicated that these individuals don't speak for us. The district court decided sui sponte, that it was going to use agency principles and somehow bind the information because, why? They didn't have any knowledge that there was open and complete communication with the United States, which is required by the evidence in the other seven circuits that look at the government inference issue. The government knowledge defense was eliminated in 1986. As Senator Grassley mentioned in his amicus brief, there was a reason for that because you could always find somebody in the government who would know something about an individual and that would be wiped out. This testimony happened seven years after the fact. All three individuals indicated, we didn't know the actual conduct that was occurring within Caremark. Can you recall back to the record that appears, a memo that appears in the record, May 1, 2008, do you know the memo you're referring to? I don't recall. It says, in keeping with past practice, if no identifier is available, a default identifier may be substituted. Providers and pharmacies are encouraged to work with their payers for such default alternatives. That memo was issued by Cynthia Tumor. That memo had to do, again, with pharmacy claims, as Judge McKee mentioned, not with PDE claims coming from the PDM. Those are having to do with pharmacy claims. That memo was prospectively looking forward. May 23, 2008, was that memo. In that memo, it also indicated, remember CBS had four opportunities, prescriber ID, UPIN, state license number, or DEA. They decided, because their systems were set up to do only one, DEA. That's why the whole purpose of swapping the DEA. That memo never says, Your Honor, you can go. It's been interpreted, but if you look at that memo, it does not say in its face, it's okay to go in there and put dummy IDs. The other thing that the memo says is, in very rare cases, if you can't come up with the NPI number, you can use other forms of state licensing, UPIN, DEA. If you take a look at Cynthia Tumor's letter of August 13, 2010, which is in the record, JLA 08031, the same woman who issues that letter that you just mentioned, she goes on to say, It's always been our intention that you must have a unique prescriber identifier. Because without having a unique prescriber identifier, there are problems with the program. There's no ability to validate. There's no ability to go back and figure out whether that doctor, in whatever part of the world, was running a print mill or et cetera. So for government inference issues, forget about the fact that on Rule 56, throughout the record, and that's why the opinion was so long, Your Honor, there was constant balancing of testimony. Every inference, every inference in the record was drawn against us. Every credibility determination was drawn against us. If you take a close look at the footnotes that accompany the record, you'll see that whenever the judge is looking at it, the trial court is looking at it, he's determining that one inference is going to go against us. We don't believe that would be the standard. We never had a chance to make the arguments that Judge Smith just made to a jury because under the summer judgment standard, it was taken away from us. All right, Mr. Risponti. Thank you. We'll have you back on rebuttal and hear from your adversary. Good morning. Ina Minnicki from the law firm of Williams & Conley for the CVS Caremark. The pronunciation of your last name again? Minnicki. Minnicki. For the CVS Caremark appellees. If I may just start addressing the last issue that was discussed. Could I get to something I hoped to get to prior to this, but ask you first of all and then allow you to get to the point you wanted to address. Do you agree this court has not previously adopted the government knowledge inference? I do agree that it has not. Should we? Should we and do we need to for purposes of this case? I don't think you need to for the purposes of this case. There are six other circuit courts that have adopted it and have clearly adopted it. I think certainly this case presents quite an opportunity for this court to do that. But I do believe – It's not inconsistent with the statutory background? Excuse me, sir? It's not inconsistent that the government knowledge difference, and I think Mr. Risponti may have referred to it as the government inference effect, is the same thing. That's not inconsistent with the statutory background? Absolutely not. In 1986, the government knowledge defense was eliminated from the False Claims Act. Thereafter, various circuit courts have held that there is a government knowledge inference. They have held that it primarily goes to the issue of scienter, which is one of the elements under the False Claims Act. But other courts have also held it goes to falsity, which is another element, and then to materiality as well. And on materiality, I just highlight for the court the Supreme Court's recent decision in Universal Health Services v. Escobar, which I think is very much on point here and could provide a key basis for affirmation of Judge Buckwalter's opinion as well. In Universal Health Services, the court, which is an implied certification case, which is not relevant here, but the Supreme Court in a unanimous decision nevertheless took up the issue of materiality and it found that when the government, quote, regularly pays a particular type of claim in full, despite actual knowledge that certain requirements were violated and has signaled no change in that position, that is strong evidence that the alleged misrepresentation is not material. Where in the record is the actual knowledge here? Excuse me? Where in the record is the actual knowledge here? The actual knowledge is in the testimony of the CMS witnesses, part of which Judge Smith quoted to, but the rest is extensively quoted. The actual knowledge is in that May 2008 memo that existed that refers to prior practices. With respect to that memo, by the way, given the last interaction or the last question, at page 34 of our brief we note the fact that the attachment to the memo does clearly reference these PDE records. So I think the position on the table was, well, it refers to this May 2008 memo refers to pharmacy claims. It's not making a reference to PDE records. We respectfully disagree with that. I think the memo on its face is clear, that it does refer to PDE records, and the explanation of that is at page 34 of our brief. With respect to the- I refer to them as placeholders, and I think they're referred to more accurately as dummy names, the algorithms that were used to put in. As in that process, there's something identical to it, analogous to it. Could the doctors have gotten paid? According to CMS, no. Just because of the way that the system was set up, the claim would have been rejected, and the doctors could not have been paid. How can we tell or how can the plaintiffs tell whether or not, since there was never a swap out of the dummy name, how can there be any certainty that prescriptions that were paid for were actually written? There's not one shred of evidence in the record, Judge McKee, that any of the prescriptions that are at issue here were false, fictitious, or not real prescriptions. How can they prove it if they can't tell who wrote the prescription? Well, they absolutely could tell who the prescriptions are for. There's a lot of information. They could walk it back from looking at the prescriptions. Correct. There's 37 separate fields in a PDE record for one particular script, and so there's a lot of information by which you could trace back particular scripts. The CMS testimony also- So, excuse me, how long was the discovery period? Two years. What do you make of Mr. Responda's argument that every factual determination was made in your favor? I completely disagree. I think, just going back to my last answer, two years is quite a long time for discovery in this matter. I believe Judge Buckwalter indulged the plaintiffs at every turn, at every angle. These depositions of the CMS witnesses that we were ultimately able to take towards the end of the discovery period were hard fought to receive. The Relators Council fought us at every turn to get those and put up roadblocks to get them. Ultimately, we were able to get those depositions, and I think that they confirmed what the relator had feared, that this is not an issue of a false claim being filed to the government. This is a purely administrative placeholder type of situation where a system was built and requirements were put out that were aspirational to some extent when it came to the prescriber identifier field. And while by 2014 those requirements had been met, up until that point those requirements were not able to be met. Ms. Menighe, I'm not trying to put words in your mouth here, but I'm asking just as I would ask the other side to agree or disagree. I got the sense in preparing for this argument, in spending time on this case, in reading various portions of the record, that what actually happened here, a bottom line interpretation of what was really going on is you have a new entitlement go into effect and things have to be accomplished to make it work. And eventually both CMS employees and officials are interested in seeing to it that on a timely basis these prescriptions get out to those entitled to them. And CVS is, of course, interested in being paid, and so there was effectively a practice, whether technically clean or not, that developed over time to see that both of those interests were accomplished or accommodated. Is that an accurate way of looking at this in your view? And I, of course, want to hear from the other side of the boat. I believe that's exactly right. Judge Smith, and I think that is the conclusion that Judge Buckwalter came to after looking at the entirety of the record. And as you may recall from having read his opinion, he noted that he read the entirety of the testimony of the three CMS officials. He did not rely simply on the excerpts that both sides chose to provide him in our summary judgment briefing, but he took the time to read the entirety of the experts of those depositions and I think expressed that what those depositions clearly conveyed to him was exactly what you articulated, Judge Smith, in that it was a brand-new program. The first priority, the first and most important priority, was making sure that access to prescriptions was not denied. And therefore, there were several workarounds that were needed. This happened to be one of them. Everybody was working together to make sure that was ready. Who was everybody? I'm sorry? Who was everybody? Everybody, CMS, as well as the plan sponsors, as well as the PBM. So those processing the prescriptions as well as those receiving the PDE records at the end of the day in the form of CMS. And I think reading those depositions, that inference comes across loud and clear, that that is what was happening and that they were fully aware of the actions that PBMs such as Caremark were taking. And, in fact, Mr. Grant testified that he recalled having conversations with PBMs and plan sponsors in the 2006 time period, which is the inception year for Medicare Part D, and told them, specifically advised them to go ahead and put in essentially dummy identifiers to get their claim processed and through. Now, given the passage of time, Mr. Grant obviously could not remember the specifics of those conversations. He was honest about that. I don't recall which ones I actually spoke to. And I think that is one of the ways that the relator is trying to take advantage of this situation and try to perpetuate the notion, well, there was not an actual conversation that anyone can document. But the record is absolutely clear that, in fact, such conversations occurred, such guidance was provided to the industry, and Caremark followed that guidance. And the guidance was from CMS? The guidance was from CMS both orally as well as in the form of the May 2008 memo, which reached back in time and essentially endorsed the past practices that had occurred. So you're saying even if the government defense, government knowledge defense, has been abolished statutorily, that we can still look at it in terms of scienter or intent? Let me address that. That's the difference. Let me address that, Judge McKee, because this is a very important point for us. So the government knowledge defense as a pure defense was abolished in 1986. However, six circuit courts thereafter have held at various points in time, and district courts in this circuit have held that there is a government knowledge inference. Now, it is not an automatic defense. It is an inference, and it most often is held to go to see enter. It sometimes is held to go to materiality, and it sometimes is held to go to falsity. I was curious about that characterization to me, since it's no longer a defense. An inference is something that is usually permissible for a finder of fact to draw. And doesn't that support the argument of Mr. Esponti here that we have questions that really ought to be not appropriately resolved on summary judgment? How do you handle an inference that way? The inference was to them. Often, you're absolutely right, Judge Smith, that often see enter is not an issue that is dealt with at summary judgment and is for the fact finder. However, cases in this circuit have determined that if there's no genuine issue of material fact, that the knowledge, state of mind, see enter element, whatever it is called, can in fact be decided at the summary judgment stage. So is the use of the term inference perhaps misleading or an inelegant way of really describing what's at work here? It may well be, and I think Judge Buckwalter recognized that in his opinion. So he called it the government knowledge inference simply because that is the term that has come to be used by the other circuits. But he made clear that his finding that the inference had been met was not the end of the inquiry. And then he went on to analyze what Caremark knew because Caremark's knowledge was next at issue. Let me stop you there. Again, we may have some important legal craftsmanship to do here in terms of actual principles if we are to adopt this government knowledge inference. What you just stated, does that suggest that what the test should be is essentially a two-pronged one? That is that the evidence needs in the first instance to demonstrate that the government agency knew what was occurring or what was being done, and two, that the defendant knew that the government knew. I don't believe that would be the formulation, Your Honor. That is a formulation that has been discussed or even adopted elsewhere, isn't it? In the Fifth Circuit, I believe, at least by way of a concurrence by Judge Jones, that was a suggestion as to the approach that ought to be taken. I agree with that. I think, just stepping back, in any analysis of a false claims act case, you must determine what the scienter evidence is. And that, by definition, goes to the defendant's knowledge. So I believe when Judge Buckwalter was reviewing the defendant's knowledge, it was in the context of a generic review of scienter. The formulation that he laid out based on the other circuits is at page 52 of his opinion, and basically is to the effect of, when the government knows and approves of the facts underlying an allegedly false claim prior to presentment, an inference arises that the claim was not knowingly submitted, regardless of whether the claim itself is actually false. And I think that when you're speaking of government knowledge, when the government knows, it is hard to perpetuate a false claim, because the crux of a false claims act violation, to quote Judge Buckwalter in some other case law, is intentionally deceiving the government. When the government knows what you are doing, it doesn't make sense. It's not logical that somehow what the defendant thought at the time they submitted a claim really matters. Now, that being said, I think in the facts of this case, Judge Buckwalter's analysis on what Caremark, the defendants in that matter, knew, and when they knew it, is very clear cut and very well supported. So in the facts of this case, he went through that analysis and made those determinations, but I agree that to the extent the circuit is considering the correct formulation of a government knowledge inference, that's something certainly to be considered. I believe my time is up. Thank you. Thank you very much. Mr. Asante, rebuttal. Well, I think you have correctly articulated what we believe a standard should be should this court decide that it wishes to illuminate what the other seven circuits have done. How do we know what the defendants' knowledge was during the relevant time period of 2006 and 2007? One snippet, which as far as I'm concerned, and demonstrates for Rule 56 purposes how an inference could have been drawn in our favor was against it. Mr. McNellis, who was in charge of PDE for Caremark, said we definitely should not be submitting a dummy DEA number. I don't know where we came up with that idea. Number two, with regard to all the circuit courts who have looked at this, and Judge Buckwalter clearly understood that he was attempting to fashion a government inference, not a government knowledge defense, because he knew that was out in 1986, because he cited all of the circuit courts. He even cited the district courts who kind of thought about it, but knew that the Third Circuit hadn't adopted it. They all turn on one thing. Not what the government knew, what did the defendant know? And what we know what the defendant knows is clear. We have multiple witnesses, all of which never got to a fact finder. With regard to the CMS witnesses, none of them knew the conduct at Caremark. None of them could go to another PBM and say that they had those discussions. Hutchinson said, prescriber IDs, not my function. Some other guys did that stuff. McCutcheon said, I'm not a PDE expert. I don't know. I think that we knew about this back in 2010. I mentioned it was made of actual knowledge. That's the Escobar test, the Supreme Court's June 2016 articulation. First of all, materiality wasn't raised below, and Escobar in a footnote deals with post-2009 conduct. This was 2006 and 2007. But if you look at Escobar and you look at the multiple tests, it says, look at actual knowledge. If the government continues to pay after actual knowledge and nothing was done, that could be important to us. When did the CMS have actual knowledge? We would submit and had it at the time that the OIG issued a very report, very similar to what Mr. Spey had raised many years earlier. That report spawned a congressional investigation. That congressional investigation caused CMS officials to be brought before the United States Congress and to testify. We have that testimony on the record. Judge Buckwalter decided that certain aspects of that testimony, all of those inferences would go against us, Rule 56. Nowhere does it say in the OIG report and CMS's response or in the testimony before the United States Congress by CMS officials acting for CMS, unlike the individuals who the United States government clearly said, do not act for us. In fact, one of the individuals, when he testified, Mr. Hutchinson, was on Karamark's payroll seven years after the fact when he was actually testifying. I was at those depositions. I would love to have a jury listen to the testimony and see what they knew, what they didn't know, and where they were. And lastly, Your Honor, with regard to the government inference, and I think Your Honors are correct, inference suggests that a fact finder gets to weigh that along with everything else. A jury, we never got that chance. But a government inference in this context, if it's not with this government knowledge, then the inference has muted into a conclusive presumption, and that takes away your summary judgment, Chad. That takes away your right to get to the jury. That's right. That's right. And I would submit, Your Honor, it takes us back to 1986. If this court were to fashion a rule that adopted a district court rule, not only did the district court come up with a government inference, but it added a prong that doesn't exist anywhere in the law that I can find, which is a generalized industry knowledge. So after the fact, you can go and find that out. Thank you, Your Honor. Thank you for meeting.